# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

In re: Operation of the Missouri
River System Litigation

_____

No. 04-2737

_____

American Rivers, Inc.;
Environmental Defense; National
Wildlife Federation; Iowa
Wildlife Federation; Kansas
Wildlife Federation; Montana
Wildlife Federation; Nebraska
Wildlife Federation; North Dakota
Wildlife Federation; South Dakota
Wildlife Federation; Izaak Walton
League of America, Inc.,

    Appellants,

    v.

United States Army Corps of
Engineers; Les Brownlee, Acting
Secretary of the United States
Army; United States Fish and
Wildlife Service; Gale Norton,
Secretary of the United States
Department of Interior,

    Appellees.

Appeal from the United States
District Court for the
District of Minnesota.

_____

State of Nebraska; Nebraska
Public Power District; State of
Missouri; State of North Dakota;
State of South Dakota;
Blaske Marine, Inc.; the Mandan,
Hidatsa and Arikara Nation;
Conocophillips Company; Ergon
Asphalt and Emulsions, Inc.;
Magnolia Marine Transport
Company; Midwest Terminal
Warehouse Company, Inc.; Mo-
ark Association; Missouri River
Keepers; Missouri River Energy
Services

      Appellees.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

_____

No. 04-2774

_____

|  | * |
| --- | --- |
| State of Nebraska, | * |
|  | * |
| Appellant, | * |
|  | * |
| v. | * |
|  | * |
| United States Army Corps of | * |
| Engineers; Les Brownlee, Acting | * |
| Secretary of the United States | * |
| Army; United States Fish and | * |
| Wildlife Service; Gale A. Norton, | * |
| Secretary of the United States | * |
| Department of Interior, | * |
|  | * |
| Appellees. | * |
| _____ | * |
|  | * |
| American Rivers, Inc.; State of | * |
| Missouri; State of North Dakota; | * |
| State of South Dakota; Blaske | * |
| Marine, Inc.; the Mandan, Hidatsa | * |
| and Arikara Nation; | * |
| Conocophillips Company; Ergon | * |
| Asphalt and Emulsions, Inc.; | * |
| Magnolia Marine Transport | * |
| Company; Midwest Terminal | * |
| Warehouse Company, Inc.; Mo- | * |
| ark Association; Missouri River | * |
| Keepers; Missouri River Energy | * |
| Services, | * |
|  | * |
| Appellees. | * |

_____

No. 04-2785

_____

Nebraska Public Power District,    \*

    \*

    Appellant,    \*

    \*

    v.    \*

    \*

United States Army Corps of    \*

Engineers; Les Brownlee, Acting    \*

Secretary of the United States    \*

Army; United States Fish and    \*

Wildlife Service; Gale Norton,    \*

Secretary of the United States    \*

Department of Interior,    \*

    \*

    Appellees.    \*

    \*

_____    \*

    \*

American Rivers, Inc.; State of    \*

Missouri; State of North Dakota;    \*

State of South Dakota; Blaske    \*

Marine, Inc.; the Mandan, Hidatsa    \*

and Arikara Nation;    \*

Conocophillips Company; Ergon    \*

Asphalt and Emulsions, Inc.;    \*

Magnolia Marine Transport    \*

Company; Midwest Terminal    \*

Warehouse Company, Inc.; Mo-    \*

ark Association; Missouri River    \*

Keepers; Missouri River Energy    \*

Services,    \*

    \*

    Appellees.    \*

_____

No. 04-2794

_____

|                                          |     |
| ---------------------------------------- | --- |
|                                          | *   |
| State of Missouri,                       | *   |
|                                          | *   |
|     Appellant,        | *   |
|                                          | *   |
|     v.                | *   |
|                                          | *   |
| United States Army Corps of              | *   |
| Engineers; Les Brownlee, Acting          | *   |
| Secretary of the United States           | *   |
| Army; United States Fish and             | *   |
| Wildlife Service; Gale Norton,           | *   |
| Secretary of the United States           | *   |
| Department of Interior,                  | *   |
|                                          | *   |
|     Appellees.        | *   |
|                                          | *   |
| _____                     | *   |
|                                          | *   |
| American Rivers, Inc.; State of          | *   |
| Nebraska; Nebraska Public Power          | *   |
| District; State of North Dakota;         | *   |
| State of South Dakota; Blaske            | *   |
| Marine, Inc.; the Mandan, Hidatsa        | *   |
| and Arikara Nation;                      | *   |
| Conocophillips Company; Ergon            | *   |
| Asphalt and Emulsions, Inc.;             | *   |
| Magnolia Marine Transport                | *   |
| Company; Midwest Terminal                | *   |
| Warehouse Company, Inc.; Mo-             | *   |
| ark Association; Missouri River          | *   |
| Keepers; Missouri River Energy           | *   |
| Services,                                | *   |
|                                          | *   |
|     Appellees.        |     |

_____

No. 04-2878

_____

| | |
|---|---|
| The Mandan, Hidatsa and Arikara Nation, | * |
| | * |
| | * |
| Appellant, | * |
| | * |
| v. | * |
| | * |
| | * |
| United States Army Corps of Engineers; Les Brownlee, Acting Secretary of the United States Army; United States Fish and Wildlife Service; Gale Norton, Secretary of the United States Department of Interior, | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| Appellees. | * |
| _____ | * |
| | * |
| | * |
| American Rivers, Inc.; Environmental Defense; National Wildlife Federation; Iowa Wildlife Federation; Kansas Wildlife Federation; Montana Wildlife Federation; Nebraska Wildlife Federation; North Dakota Wildlife Federation; South Dakota Wildlife Federation; Izaak Walton League of America, Inc.; State of Nebraska; Nebraska Public Power District; State of Missouri; State of North Dakota; State of South Dakota; Blaske Marine, Inc.; | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |

Conocophillips Company; Ergon
Asphalt and Emulsions, Inc.;
Magnolia Marine Transport
Company; Midwest Terminal
Warehouse Company, Inc.; Mo-
ark Association; Missouri River
Keepers; Missouri River Energy
Services,

  Appellees.

   _____

   No. 04-2994

   _____

Blaske Marine, Inc.;
Conocophillips Company; Ergon
Asphalt and Emulsions, Inc.;
Magnolia Marine Transport
Company; Midwest Terminal
Warehouse Company, Inc.; Mo-
ark Association; Missouri River
Keepers,

  Appellant,

  v.

United States Army Corps of
Engineers; Les Brownlee, Acting
Secretary of the United States
Army; United States Fish and
Wildlife Service; Gale Norton,
Secretary of the United States
Department of Interior,

  Appellees.

_____  　　　　　*
　　　　　　　　　　　　　　　 *
American Rivers, Inc.;　　　　 *
Environmental Defense; National　*
Wildlife Federation; Iowa　　　 *
Wildlife Federation; Kansas　　 *
Wildlife Federation; Montana　　 *
Wildlife Federation; Nebraska　 *
Wildlife Federation; North Dakota　*
Wildlife Federation; South Dakota　*
Wildlife Federation; Izaak Walton　*
League of America, Inc.; State of　*
Missouri; State of North Dakota;　*
State of South Dakota; the　　　 *
Mandan, Hidatsa and Arikara　　 *
Nation; Missouri River Energy　 *
Services,　　　　　　　　　　　 *
　　　　　　　　　　　　　　　 *
　　　Appellees.　　　　　　　 *

_____

Submitted: April 11, 2005
Filed: August 16, 2005

_____

Before WOLLMAN, BEAM, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

In these consolidated appeals, various parties challenge the operation of the Missouri River main stem reservoir system by the United States Army Corps of Engineers ("the Corps") and associated wildlife assessments produced by the United

States Fish and Wildlife Service ("FWS"). The district court[1] granted summary judgment to the Corps and FWS and their named individual officers (collectively "the Federal Defendants") on all claims. For the reasons stated below, we dismiss three claims as moot and affirm the judgment of the district court on all remaining claims.

## I.    BACKGROUND

The Missouri River originates in Montana and runs through North Dakota, South Dakota, Nebraska, Iowa, Kansas and Missouri before emptying into the Mississippi River. In its natural state, the river subjected the surrounding basin to extensive flooding every spring. With the Flood Control Act of 1944 ("FCA"), Congress authorized the construction of a dam and reservoir system on the upper river to control the flooding. In addition to flood control, the FCA envisioned that the reservoirs would provide water for local irrigation projects, steady release into the river during the summer months to support downstream navigation, hydroelectric power generation and lake recreation. The FCA delegated construction and management of the main stem reservoir system to the Corps.[2]

The current challenges to the Corps' operation of the system arise from two directions. First, a persistent drought in the Missouri River basin has led to a recurring conflict between upstream and downstream water-use interests. In 2002, the Corps planned to release water from Lake Oahe into the river to maintain downstream navigation throughout the summer. South Dakota, fearing a negative

---

[1]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

[2]The main stem dams and reservoirs are Fort Peck Dam (Fort Peck Lake) in Montana, Garrison Dam (Lake Sakakawea) in North Dakota, and Oahe Dam (Lake Oahe), Big Bend Dam (Lake Sharpe), Fort Randall Dam (Lake Francis Case) and Gavins Point Dam (Lewis and Clark Lake) in South Dakota.

impact on the seasonal fish spawn in Lake Oahe and concordantly on the reservoir's sport fishing industry, obtained an injunction in federal district court preventing the Corps from lowering any reservoir in South Dakota until after spawning season. When the Corps decided to lower Lake Sakakawea instead, North Dakota obtained a similar injunction. Not to be outdone, Montana obtained an injunction to prevent releases from Fort Peck Lake. In response, Nebraska obtained an injunction ordering the Corps to make the required releases to support navigation as called for by the Corps' Missouri River Main Stem Reservoir System Master Water Control Manual ("1979 Master Manual").

In a consolidated appeal of these injunctions, we ruled that the FCA vested the Corps with discretion to balance the competing water-use interests. *South Dakota v. Ubbelohde*, 330 F.3d 1014, 1027 (8th Cir. 2003). Because the FCA's legislative history and its interpretation by the Supreme Court "indicate[] that the Corps's primary concerns should be flood control and navigation," we upheld the Corps' decision to follow the 1979 Master Manual and draw down the reservoirs to support downstream navigation. *Id.* at 1032.

The second point of conflict has been that flood prevention and steady summer flows for downstream navigation disrupt the natural habitat of protected bird and fish species in the Missouri River ecosystem. In litigation initially separate from the *Ubbelohde* cases, environmental groups have attempted to force the Corps to operate the system to produce more "natural" river flows to benefit the protected species. To understand the current stances of the parties in this litigation, it is necessary to review in some detail the Corps' previous attempts to accommodate competing interests while developing its operating procedures.

The Corps sets forth its general operational guidelines for the Missouri River reservoir system in a Master Manual and the operational details for each year in an Annual Operating Plan. The first Master Manual was published in 1960 and revised

in 1973, 1975 and 1979. The year 1987 brought the onset of the first persistent drought in the region since the reservoir system had become fully operational. Because it found that the operational procedures in the 1979 Master Manual were not well-tailored to handle a persistent drought, the Corps began the revision process for what would become the 2004 Master Manual.

The operation of the reservoir system also brings the Corps within the provisions of the Endangered Species Act ("ESA"). Under the ESA, if a government agency concludes that a proposed action may "jeopardize the continued existence" of any protected species or adversely affect its critical habitat, the agency must prepare a Biological Assessment and consult with the FWS. ESA § 7, 16 U.S.C. § 1536. The FWS then issues a Biological Opinion ("BiOp") describing how the action will affect the species, based on the "best scientific and commercial data available." *Id.* at § 1536(a)(2). If the FWS concludes that the proposed action would cause jeopardy to an endangered or threatened species, the BiOp must include a Reasonable and Prudent Alternative which would allow the agency to implement the desired action while avoiding jeopardy to the species. *Id.* at § 1536(b)(3)(A). Finally, if it appears incidental "take"[3] will occur even if the Reasonable and Prudent Alternative is implemented, the BiOp must include an Incidental Take Statement setting conditions under which the agency may proceed while avoiding liability for the incidental harm to the protected species. *Id.* at § 1536(b)(4).

The Corps followed the above process with three protected species in the Missouri River basin: the pallid sturgeon, a fish listed as endangered since 1990; the least tern, a migratory bird listed as endangered since 1985; and the piping plover, a migratory bird listed as threatened since 1985. The pallid sturgeon spends its entire

---

[3]The ESA prohibits "taking" of endangered species. "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." ESA § 3(14), 16 U.S.C. § 1532(19).

life cycle in the Missouri and Mississippi Rivers and their tributaries, while the tern and plover both nest in the summer on sparsely vegetated sandbars along the rivers. In 2000, the FWS issued a Biological Opinion ("2000 BiOp") finding that the Corps' proposed operation of the reservoir system was likely to jeopardize the continued existence of the three species.

The FWS found that the harm to the species resulted from the alteration of the river's natural hydrograph.[4] Before the construction of the dams, the hydrograph had two prominent components: the "spring rise" and "summer low flow." The "spring rise" refers to extremely high flows in late spring resulting from the spring thaw. According to the 2000 BiOp, the spring rise provided a biological spawning cue for the pallid sturgeon and enabled the river to capture protein-rich nutrients from the floodplain and from wetland habitat not connected to the river channel during other seasons. In concert with the summer low flow, the spring rise also provided seasonal connectivity to the off-channel wetland habitat, making calm, shallow pools available to the pallid sturgeon for spawning, nursery and feeding areas. Lower elements of the food chain also were forced to congregate in the remaining pools, providing easy summer feeding for the protected species. In addition, the spring rise scoured and flushed sandbars. When the now-sparsely-vegetated sandbars were exposed by the summer low flow, the resulting lack of cover for concealed predators allowed terns and plovers to nest there safely.

The Corps' operation of the reservoir system, generally capturing water in the upstream reservoirs to eliminate spring flooding and releasing water throughout the summer and fall as necessary to enable downstream navigation and restore reservoir capacity for the following spring, eliminated the spring rise and summer low flow from the hydrograph. The Reasonable and Prudent Alternative included with the

---

[4]A river's "hydrograph" is the variation in water level at each point along its channel over the course of time.

2000 BiOp ("2000 BiOp RPA") stated that "higher spring and lower or declining summer flows than now exist"[5] were "an integral component of the measures to avoid jeopardy" to the three protected species. The 2000 BiOp RPA also mandated habitat restoration, a comprehensive species and habitat monitoring program, and an adaptive management framework to "implement, evaluate, and modify the components of the RPA in response to variable river conditions, species responses, and increasing knowledge base."

In an attempt to support downstream water-use interests despite the continuing drought in the basin, the Corps released a draft Annual Operating Plan for 2003 that did not incorporate the flow changes from the 2000 BiOp RPA. Environmental interest groups filed suit under the ESA in the United States District Court for the District of Columbia to enjoin operations under that plan. At the Corps' request, the FWS then issued a supplemental biological opinion ("the 2003 Supplemental BiOp") that ratified the Corps' plan to avoid the 2000 BiOp RPA flows for the period of May 1 through August 15, 2003, with the understanding that operations after 2003 would be consistent with the 2000 BiOp. Before the district court, however, the Corps revealed that it had no intention of ensuring that its future operations would so comply. *Am. Rivers v. United States Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 253 (D.D.C. 2003). In addition, the district court held that it was improper for the FWS

_____

[5]The 2000 BiOp presented data from Corps models showing that, with the reservoirs and channel improvements in place, the "natural hydrograph" today would be expected to produce a spring rise of 80 Kcfs (Kcfs = thousand cubic feet per second) and a summer low flow of 10 Kcfs at the Gavin's Point Dam, the final reservoir release point into the lower river. Under the 1979 Master Manual, flow at that point was typically maintained steadily between 30-35 Kcfs from March through November. The 2000 BiOp RPA called instead for a spring rise from Gavin's Point totaling 50-55 Kcfs to be implemented about once every three years, and an annual summer low flow of 25 Kcfs, ramped down to 21 Kcfs from mid-July through mid-August. The flow required for minimum support of downstream navigation is about 28.5 Kcfs, depending upon the accompanying inflow from downstream tributaries.

to focus on the effects that the proposed action would have on the protected species during 2003 only, rather than on all future effects of the proposed action, and that the 2003 Supplemental BiOp failed to articulate a reasonable explanation for its departure from the analysis in the 2000 BiOp. *Id.* at 254-57. Therefore, the district court granted the injunction and ordered the Corps to comply with the summer low flow provisions of the 2000 BiOp. *Id.* at 263. Citing a conflict with this Court's *Ubbelohde* holding that required operation consistent with the 1979 Master Manual, the Corps initially failed to comply with the injunction and was held in conditional contempt. *See Am. Rivers v. United States Army Corps of Eng'rs*, 274 F. Supp. 2d 62 (D.D.C. 2003). Two days later, the Federal Judicial Panel on Multi-District Litigation consolidated all litigation regarding the operation of the Missouri River main stem reservoir system, including new suits by the parties involved in *Ubbelohde*, in the District of Minnesota ("MDL court"). On the order of that court, the Corps complied with the summer low flow provisions of the 2000 BiOp RPA for the brief remainder of the 2003 summer period.

At that point, the Corps prepared a new Biological Assessment with the goal of finding a way to avoid jeopardy to the protected species without following the 2000 BiOp RPA flow requirements. In the fall of 2003, the Corps presented the new Biological Assessment to the FWS and requested a new Biological Opinion. In response, the FWS issued an Amendment to the 2000 BiOp ("the 2003 Amended BiOp"). The 2003 Amended BiOp RPA permitted the Corps to avoid the summer low flow requirement on the condition that it construct 1,200 additional acres of shallow water habitat for the pallid sturgeon. In addition, it gave the Corps two more years to experiment with alternatives to a spring rise. If the Corps could not produce an acceptable alternative plan, the RPA imposed a default spring rise of reduced magnitude beginning in the spring of 2006.

The Corps continued to develop the 2004 Master Manual by complying with the provisions of the National Environmental Policy Act ("NEPA"). *See* 42 U.S.C.

-14-

§§ 4321 *et seq.* NEPA requires the preparation of a detailed Environmental Impact Statement ("EIS") for every major federal action that will significantly affect the quality of the environment. 42 U.S.C. § 4332(C). The EIS must also evaluate alternatives to the proposed action. *Id.* In this case, the Corps compared five potential water control plans in its EIS before adopting the Preferred Alternative, a plan consistent with the 2003 Amended BiOp, as the basis for the 2004 Master Manual. The MDL court truncated the NEPA public-comment-and-review period and ordered all plaintiffs in this litigation to amend their complaints to address the 2004 Master Manual and 2004 Annual Operating Plan.

After the issuance of the 2004 Master Manual and 2004 Annual Operating Plan, various parties filed motions for summary judgment. The district court granted summary judgment to the Federal Defendants on all claims on the bases that (1) the FCA does not create a non-discretionary duty in the Corps to maintain minimum navigation flows or a minimum length for the navigation season, and (2) the discretionary decisions made by the Federal Defendants in balancing water-use interests under the FCA and in avoiding jeopardy to the protected species were not arbitrary and capricious.

The parties now make various arguments on appeal. The states of Missouri and Nebraska and the Nebraska Public Power District ("NPPD") argue that the 2004 Master Manual violates a non-discretionary duty of the Corps under the FCA to maintain river flow sufficient to support uninterrupted downstream navigation throughout the navigation season. Nebraska and NPPD also argue that the 2003 Amended BiOp is in conflict with the purported FCA minimum-flow requirement, while Missouri argues that the 2003 Amended BiOp violates the ESA because it will eliminate some pallid sturgeon habitat in the lower Missouri River. American Rivers, the National Wildlife Federation, several state Wildlife Federations and the Izaak Walton League of America (collectively "American Rivers") argue that the 2003 Amended BiOp is arbitrary and capricious because it does not insure against jeopardy

to the three protected species. In addition, American Rivers contends that the EIS was faulty because the Corps failed to explain why the Preferred Alternative was superior to another evaluated alternative. Blaske Marine, ConocoPhillips Company, Ergon Asphalt & Emulsions, Inc., Magnolia Marine Transport Company, Midwest Terminal Warehouse Company, Inc., MO-ARK Association and Missouri River Keepers (collectively "Blaske Marine") argue that a supplemental EIS is required for a contingent summer low flow that the Corps still has the discretion to implement. Finally, the Mandan, Hidasta and Arikara Nation ("the Nation") contends that the Corps must operate Lake Sakakawea (Garrison Dam) for the economic benefit of the Nation's members.

## II.    DISCUSSION

"We review de novo a grant of summary judgment, applying the same legal standards used by the district court." *Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir. 2004). We review the actions of the Corps and FWS under the Administrative Procedure Act "to determine whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"[6] *Ubbelohde*, 330 F.3d at 1027 (quoting 5 U.S.C. § 706(2)(A)). An arbitrary and capricious action is one in which:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence

[6]Nebraska and NPPD argue that the Corps has attempted to evade judicial review under the Administrative Procedure Act by stating in a letter that it did not intend for the 2004 Master Manual to be considered a binding regulation. We established in *Ubbelohde* that the 1979 Master Manual was binding and subject to judicial review. 330 F.3d at 1027-30. The Corps has conceded, both in district court and in its briefs on appeal, that the 2004 Master Manual is still binding on the Corps and subject to judicial review.

before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Cent. S.D. Coop. Grazing Dist. v. Sec'y of the United States Dep't. of Agric.*, 266 F.3d 889, 894 (8th Cir. 2001) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "If an agency's determination is supportable on any rational basis, we must uphold it." *Voyageurs Nat'l Park Ass'n*, 381 F.3d at 763. "When the resolution of the dispute involves primarily issues of fact and analysis of the relevant information 'requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies.'" *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1128 (8th Cir. 1999) (quoting *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 (1989)).

## A. The Corps' FCA Duty to Support Downstream Navigation

Missouri, Nebraska and NPPD (collectively "the downstream parties") argue that the 2004 Master Manual is not in accordance with law because, under certain drought conditions, it calls for canceling the navigation season in order to hold water in the reservoirs for the benefit of recreation. The MDL court concluded that the FCA imposes no duty to maintain a minimum level of downstream navigation independent of consideration of other interests. We agree.

This Court has already addressed thoroughly the balance of interests under the FCA. In *Ubbelohde*, we relied on the Supreme Court's decision in *ETSI Pipeline Project v. Missouri*, 484 U.S. 495 (1988), and the legislative history of the FCA to determine that "[t]he dominant functions of the Flood Control Act were to avoid flooding and to maintain downstream navigation," while "the Act recognizes secondary uses of the River including irrigation, recreation, fish, and wildlife." *Ubbelohde*, 330 F.3d at 1019-20. However, the FCA does not set forth what level of river flow or length of navigation season is required to make navigation "dominant"

over a "secondary" interest such as recreation. Instead, "the courts can review the Corps's decisions to ensure that it considered each of these interests before making a decision," but "the Act does not provide . . . a method of deciding whether the balance actually struck by the Corps in a given case is correct or not." *Id.* at 1027.

The downstream parties challenge the provisions of the 2004 Master Manual referred to as "navigation precludes." The amount of water stored in the entire reservoir system is checked on March 15 and July 1 of each year. If total system storage falls below the "volumes . . . that allow the System to function to meet authorized purposes during significant multi-year drought periods," navigation support is reduced or eliminated for that year. 2004 Master Manual § 7-03. The EIS estimates, based on the modeling of historical data from 1898 to 1997, that the selected navigation-preclude volumes will lead to the elimination of the entire navigation season only in the four worst drought years out of every one hundred years, and to a navigation season shortened from eight-plus months to less than seven months only in the eight worst drought years out of every one hundred. Under these circumstances, we cannot say that the Corps failed to consider downstream navigation before making its decision.[7]

---

[7]The Corps states in § 7-01 of the 2004 Master Manual that in the FCA, "Congress did not assign a priority to these purposes" of "flood control, navigation, irrigation, hydropower, . . . recreation, and fish and wildlife. . . ." To the contrary, as we clearly stated in *Ubbelohde*, the FCA has been interpreted to hold flood control and navigation dominant and recreation, fish and wildlife secondary. *Ubbelohde*, 330 F.3d at 1019-20. If, due to extreme conditions, the Corps is faced in the future with the unhappy choice of abandoning flood control or navigation on the one hand or recreation, fish and wildlife on the other, the priorities established by the FCA would forbid the abandonment of flood control or navigation. While we hold today that the 2004 Master Manual does not "abandon" navigation, we do not rule out the possibility that some more limited degree of support for flood control or navigation in the future could be held to constitute "abandonment" of these dominant functions. *See also infra* note 9.

Appellees North Dakota and South Dakota argue that because damage to the recreation industry would have a more dramatic negative economic impact than would damage to the navigation industry, recreation should receive special priority. Nothing in the text or legislative history of the FCA suggests that Congress intended the priority of interests under the FCA to shift according to their relative economic value. Arguments based on the wisdom of the priorities established by the FCA must be addressed to Congress.[8]

The Corps' balancing of water-use interests in the 2004 Master Manual is in accordance with the FCA. Because the 2004 Master Manual does not evidence a failure to consider the support of downstream navigation, it is not arbitrary and capricious. Therefore, we affirm the grant of summary judgment to the Corps on this claim.

## B. The Corps' Duty to Consult with the FWS under ESA § 7

Nebraska and NPPD argue that it was not in accordance with law for the Corps to engage in the ESA § 7 consultation process with the FWS regarding the operation of the reservoir system. They contend that the ESA does not apply to the operation of the reservoir system because ESA compliance would interfere with downstream navigation, a project purpose that is mandated by statute such that the Corps has no

___

[8]Appellee South Dakota also argues that the O'Mahoney-Millikin Amendment, 33 U.S.C. § 701-1(b), prioritizes the retention of water in the reservoirs over downstream navigation. The MDL court granted summary judgment against South Dakota on this issue, and South Dakota did not appeal. We, therefore, construe South Dakota's argument in opposition to the appellant downstream parties to be that the O'Mahoney-Millikin Amendment would forbid, for the purposes of supporting navigation, any further lowering of the navigation-preclude volumes beyond those implemented in the 2004 Master Manual. Because we find against the appellant downstream parties on this issue on other grounds, we need not address appellee South Dakota's argument.

discretion in meeting it. *See* 50 C.F.R. § 402.03 ("Section 7 [of the ESA] and the requirements of this part apply to all actions in which there is *discretionary* Federal involvement or control.") (emphasis added).

Case law supports the contention that environmental- and wildlife-protection statutes do not apply where they would render an agency unable to fulfill a non-discretionary statutory purpose or require it to exceed its statutory authority. For example, in *National Wildlife Federation v. United States Army Corps of Engineers*, 384 F.3d 1163 (9th Cir. 2004), the Ninth Circuit held that the Corps' operation of four dams on the Snake River did not violate the Clean Water Act. The challenged noncompliance with water standards was caused by "the existence of the dams and not any discretionary method of operating the dams," and the Clean Water Act could not be construed to supersede "the Corps's operation of the dams consistent with the purposes stated by Congress." *Id.* at 1178-79.

Similarly, in *Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC*, 962 F.2d 27 (D.C. Cir. 1992), the Federal Energy Regulatory Commission (FERC) was authorized by statute to issue annual licenses to hydropower providers on the Platte River. The enabling statute forbade alteration of the terms of an annual license without agreement from the licensee. Environmental groups sued FERC, arguing that the ESA required the imposition of wildlife-protection terms in the licenses. The court held that the ESA did not apply to the licenses because the ESA did not authorize FERC to override the statutory prohibition on altering the licenses. *Id.* at 32-34. In effect, *Platte River Whooping Crane* affirmed that the ESA does not apply where an agency has no statutory authority to act with discretion.

Cases such as *National Wildlife Federation* and *Platte River Whooping Crane* are inapposite to the instant case, however, because compliance with the ESA does not prevent the Corps from meeting its statutory duty under the FCA to support downstream navigation. As we stated above, the FCA does not mandate a particular

level of river flow or length of navigation season, but rather allows the Corps to decide how best to support the primary interest of navigation in balance with other interests. The 2004 Master Manual demonstrates that the Corps can comply with the elements of the 2003 Amended BiOp RPA while continuing to operate the dams "consistent with the purposes stated by Congress" in the FCA.[9] *Nat'l Wildlife Fed'n*, 384 F.3d at 1179.

Because the Corps is able to exercise its discretion in determining how best to fulfill the purposes of the reservoir system's enabling statute, the operation of the reservoir system is subject to the requirements of the ESA. It was therefore in accordance with law for the Corps to consult with the FWS to produce the 2003 Amended BiOp. We affirm the grant of summary judgment to the Federal Defendants on this claim.

## C.  Mootness of Claims Based on Summer Low Flow

Several of the claims against the Federal Defendants challenge the conditional summer low flow element of the 2003 Amended BiOp RPA. The Federal Defendants argue that these claims are now moot because the Corps has successfully completed the mechanical construction of 1,200 acres of shallow water habitat, which permits the Corps to avoid the summer low flow requirement.[10] The Corps has announced that it has no plans to implement summer low flows in the foreseeable future. Missouri, NPPD and Blaske Marine counter that because the Corps retains the

_____

[9]It follows that if future circumstances should arise in which ESA compliance would force the Corps to abandon the dominant FCA purposes of flood control or downstream navigation, the ESA would not apply. *See supra* note 7.

[10]American Rivers has challenged the successful completion of the 1,200 acres in the MDL court. The MDL court dismissed the suit without prejudice for procedural reasons. That dismissal has been separately appealed to this Court, Docket No. 05-1200, and is still pending.

discretion to implement the summer low flow in any given year under its adaptive management framework, these claims fall within the "capable of repetition, yet evading review" exception to mootness. *Ubbelohde*, 330 F.3d at 1023 (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)).

We conclude that the claims based on summer low flow are moot. The "capable of repetition, yet evading review" exception "applies when two conditions are met: '(1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again.'" *Id.* (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)).

In this case, it appears that the 30-day duration of a summer low flow period, particularly if it is implemented with little prior warning, is too short to be fully litigated prior to expiration. However, there is no reasonable expectation that the Corps will implement the 2003 Amended BiOp summer low flow in the future. Although a "'party need not show with certainty that the situation will recur,'" a "speculative possibility is not a basis for retaining jurisdiction over a moot case." *McCarthy v. Ozark Sch. Dist.*, 359 F.3d 1029, 1036 (8th Cir. 2004) (quoting *Van Bergen v. Minnesota*, 59 F.3d 1541, 1547 (8th Cir. 1995)). We are aware that the 2003 Amended BiOp requires the Corps to be ready to implement summer low flows as low as 21 Kcfs in the future if monitoring reveals that the alternate measures are not benefitting the protected species as expected. Nevertheless, as we discuss later in this opinion, at this point there is no reason to doubt the utility of those alternate measures. Therefore, "we find nothing to suggest a likelihood" that the Corps will decide to implement a summer low flow in future years. *McCarthy*, 359 F.3d at 1036.

Because there is no reasonable expectation at this point in time that the Corps will implement the 2003 Amended BiOp summer low flow in the future, we conclude that the following claims are moot: (1) NPPD's claim that the FWS failed to consider

the economic feasibility of the summer low flow requirement in developing the 2003 Amended BiOp; (2) Missouri's claim that the loss of shallow water habitat for larval and juvenile pallid sturgeon in central Missouri state resulting from summer low flow constitutes an impermissible "take" of the sturgeon under ESA § 9; and (3) Blaske Marine's NEPA claim that a supplemental EIS is required for the 2003 Amended BiOp summer low-flow requirement. We vacate the MDL court's grant of summary judgment to the Federal Defendants on these claims and instruct the MDL court to dismiss these claims without prejudice.

## D. The Validity of the 2003 Amended BiOp

NPPD argues that the 2003 Amended BiOp is invalid because the FWS violated regulations applicable to Biological Opinions. American Rivers challenges the 2003 Amended BiOp on the grounds that the 2003 Amended BiOp RPA contradicts its own factual findings and the administrative record and does not insure against jeopardy to the protected species.

### 1. The Environmental Baseline for the 2003 Amended BiOp

NPPD contends that the FWS used an improper environmental baseline in producing the 2003 Amended BiOp. "The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area . . . ." 50 C.F.R. § 402.02. Jeopardy to the protected species resulting from the proposed action is measured relative to the species' status under the baseline. *Id.* The FWS used a "run-of-the-river" baseline in which the dams and physical channel modifications are assumed to be in place, but all floodgates are assumed to be wide open, with no flow control. NPPD argues that normal operation under the 1979 Master Manual was the proper baseline because it is a "past impact" of a separate federal action and would continue to control operations absent the proposed action. Because continued operation under the 1979 Master Manual would

cause the protected species' chances of recovery to deteriorate, its inclusion in the baseline would tend to eliminate a finding of jeopardy for any proposed action.

According due deference to the FWS' interpretation of its own regulations, *Friends of the Boundary Waters Wilderness*, 164 F.3d at 1121, we agree with the FWS that hypothetical continued operation under the previous version of the Master Manual in future years, as the alternative to the proposed action of updating the Master Manual, does not in any sense constitute a "past impact" of federal action. As the district court recognized, this argument is essentially a different twist on the argument that the Corps has no discretion in operating the reservoir system. If the FCA mandated that the Corps must manage the system to enable, for example, a barge of specific size riding a specific depth below the waterline to navigate the river between Sioux City and the Mississippi River at all times between April 1 and December 1, there would be some merit to including that non-discretionary condition in the environmental baseline along with the permanent physical presence of the dams and channel modifications. However, given that the FCA "clearly gives a good deal of discretion to the Corps in the management of the River," *Ubbelohde*, 330 F.3d at 1027, we cannot say that it was arbitrary and capricious for the FWS not to include a specific operational profile in the environmental baseline. Therefore, we affirm the grant of summary judgment to the Federal Defendants on this claim.

## 2. *Use of the Best Scientific and Commercial Data Available*

NPPD argues that the FWS did not rely on the best scientific data available in its efforts to create a "normalized" hydrograph in the 2003 Amended BiOp RPA. "In formulating its biological opinion, [and] any reasonable and prudent alternatives . . . the [FWS] will use the best scientific and commercial data available." 50 C.F.R. § 402.14(g)(8); *see* 16 U.S.C. § 1536(a)(2).

To create a normalized version of the summer low flow portion of the natural hydrograph, the 2003 Amended BiOp calls for low flows beginning in July. NPPD directs our attention to a United States Geological Survey report in the administrative record showing that, before construction of the dams, the lowest summer flows usually occurred between August and early October. NPPD contends that this incongruity evidences a failure to use the best scientific data available to formulate the 2003 Amended BiOp.

The administrative record as a whole shows that the FWS did not ignore the best scientific data on the summer low flow in formulating the 2003 Amended BiOp. For example, in a document e-mailed by the FWS to new members of the 2003 Amended BiOp development team in November 2003, the FWS recognized that "[t]he historic hydrograph began to fall at Gavins Point in mid-June and reached it's [sic] lowest levels in the fall months," but indicated that the FWS proposal would end the low flow period in August because higher releases in the fall were necessary "to evacuate any excess water [from the reservoirs] prior to the next water year." The FWS then stated that, "[w]hile this approach is not a perfect fit to the historic hydrograph, we believe that it sufficiently mimics . . . the natural hydrograph" to have the necessary beneficial effect on the protected species.

The FWS has never found that an exact replication of the natural hydrograph was necessary to avoid jeopardy to the protected species, and the record shows "a rational connection between the facts found and the decision made" about the timing of the low flow period. *Giford Pinchot Task Force v. United States Fish & Wildlife Serv.*, 378 F.3d 1059, 1065 (9th Cir. 2004). Therefore, we affirm the grant of summary judgment to the Federal Defendants on this claim.

### 3. The Consistency of the 2003 Amended BiOp Factual Findings and the RPA for the Pallid Sturgeon

American Rivers argues, on the basis of the factual findings in the 2003 Amended BiOp and the administrative record underlying it, that the conditional replacement of the 2000 BiOp RPA summer low flow requirement with the mechanical construction of 1,200 additional acres of artificial shallow water habitat for the pallid sturgeon is arbitrary and capricious.

The 2003 Amended BiOp incorporated findings from the 2000 BiOp and stated that "[u]ntil a semblance of the normalized hydrograph is restored and habitat is generated and maintained through re-establishment of these [ecological] processes, listed species will continue to decline." In addition, the executive summary of the 2003 Amended BiOp summarizes, with regard to the pallid sturgeon:

> The proposed accelerated habitat restoration program in the Lower Missouri River will have little benefit to the pallid sturgeon without a concurrent or subsequent change in operations to provide a more normalized hydrograph to (1) provide the spawning cues that are critical for pallid sturgeon reproduction and (2) allow larvae and juveniles to move into shallow water habitat.

American Rivers contends that the above statements, and others like them in the administrative record, show that the FWS was irrational in abandoning any semblance of half of the natural hydrograph, the summer low flow, in exchange solely for habitat construction. However, evidence in the record adequately explains the decision made by the FWS. First, Appendix A of the Corps' 2003 Biological Assessment, entitled "New Information Since the 2000 BiOp," includes the results of extensive modeling of the river showing that the proposed 2000 BiOp summer low flow would be expected to increase suitable shallow water habitat by 1,189 acres over that existing during regular summer service flows. The creation of 1,200 acres of

habitat, therefore, provides the same total acreage of accessible calm, shallow pools during regular summer service flows as the 2000 BiOp summer low flow would have produced. Second, the 2003 Amended BiOp RPA retains a spring rise requirement, and the Corps must tailor the spring rise to provide the necessary biological spawning cues and floodplain connectivity with the shallow water habitat. Third, the 2003 Amended BiOp RPA requires the Corps to monitor the pallid sturgeon population and collaborate with the FWS to adjust these measures if necessary. Finally, the avoidance of summer low flow preserves the existing Lisbon chute shallow water habitat, the only site in the river where larval pallid sturgeon occur naturally, from potential damage.

American Rivers argues that the 2003 Amended BiOp did not state that the mechanical construction of 1,200 acres was designed to replace the additional acreage that would have resulted from summer low flow. American Rivers contends that this rationale is therefore an impermissible post hoc rationalization by counsel. "[C]ourts may not accept appellate counsel's post hoc rationalizations for agency action." *Motor Vehicle Mfrs.*, 463 U.S. at 50. However, there is no requirement that every detail of the agency's decision be stated expressly in the 2003 Amended BiOp. The rationale is present in the administrative record underlying the document, and this is all that is required. *Mo. Coalition for the Env't v. Corps of Eng'rs of the United States Army*, 866 F.2d 1025, 1031 (8th Cir. 1989), *overruled on other grounds*, *Goos v. ICC*, 911 F.2d 1283 (8th Cir. 1990). Therefore, the Federal Defendants' rationale is not an impermissible post hoc rationalization.

We conclude that the Federal Defendants have demonstrated a rational connection between the facts in the record and the decision to substitute 1,200 mechanically constructed acres of shallow water habitat for the 1,189 acres that would have been created by the 2000 BiOp summer low flow. Therefore, we affirm the grant of summary judgment to the Federal Defendants on this claim.

*4. The Consistency of the 2003 Amended BiOp Factual Findings and the RPA for the Least Tern and Piping Plover*

American Rivers argues that the elimination of the 2000 BiOp RPA spring rise and summer low flow requirements for the benefit of the least tern and piping plover is arbitrary and capricious. The 2000 BiOp flow requirements for the tern and plover were premised on factual findings that a spring rise was necessary to scour vegetation from sandbars, while the summer low flow would expose the resulting sparsely vegetated sandbars for safe nesting. The 2003 Amended BiOp RPA replaced the spring rise and summer low flow requirements with increased focus on the mechanical construction and clearing of sandbar habitat for the birds and adjustment of flow levels during the nesting season to minimize the potential for flooding nests.

In making these changes in the 2003 Amended BiOp, the FWS had the benefit of a new Corps analysis of the river's geomorphological processes. The Corps' computer models indicated that, given the man-made alterations to the river channel, a spring rise as envisioned in the 2000 BiOp would not produce scoured sandbar habitat for use by the tern and plover. In fact, the models showed that those flows were more likely to reduce the quality of previously available habitat.

The 2003 Amended BiOp also included information about tern and plover populations that was not available for the 2000 BiOp. The updated information included the fact that "recent counts of least terns (approximately 12,305 terns in 2003) exceed the overall recovery objective of 7,000 birds," although geographic distribution and population stability goals were not yet satisfied. Regarding the recovery goal for piping plovers, the 2003 Amended BiOp stated that "[i]n 2001, the Missouri River exceeded this recovery goal for the first time. It was also exceeded in 2002 and 2003."

Based on this new information, it was rational for the FWS to conclude that the 2000 BiOp spring rise and summer low flow elements were not necessary to avoid jeopardy to the tern and plover, and to instruct the Corps to focus its resources on the mechanical construction of habitat, monitoring and adaptive management.

American Rivers cites the lack of conclusive proof in the administrative record that the mechanically constructed sandbars will develop into an ecologically functional habitat for the plover and tern. American Rivers contends that, without such conclusive proof, the 2003 Amended BiOp RPA fails to satisfy the ESA § 7 requirement that the plan "insure" against jeopardy to the listed species. This argument fails because, while the proposed mitigation measures must insure against jeopardy to the protected species if they work as intended, while there must be a rational reason to expect them to work as intended, and while they must in fact be possible to implement, there is no requirement for the FWS to ensure the overall success of the plan. *See Southwest Ctr. for Biological Diversity v. United States Bureau of Reclamation*, 143 F.3d 515, 523-24 (9th Cir. 1998). We also note that the 2003 Amended BiOp requires the Corps to monitor closely the performance of the mechanically constructed sandbar habitat and test methods of improving the mix of organic material in the sandbars.

Finally, American Rivers cites its own experts for the contention that the higher-magnitude 2000 BiOp RPA spring rise would be more beneficial to the protected species than the default spring rise in the 2003 Amended BiOp RPA. We need not address that contention:

> [The FWS] was not required to pick the first reasonable alternative [it] came up with in formulating the RPA. [It] was not even required to pick the best alternative or the one that would most effectively protect the [species] from jeopardy. The [FWS] need only have adopted a final

RPA which complied with the jeopardy standard and which could be implemented by the agency.

*Southwest Ctr. for Biological Diversity*, 143 F.3d at 523 (quotation omitted).

"Because there was a rational connection between the facts found in the [BiOp] and the choice made to adopt the final RPA, and because we must defer to the special expertise of the FWS in drafting RPAs that will sufficiently protect endangered species," the decision to eliminate the 2000 BiOp flow changes from the 2003 Amended BiOp RPA for the plover and tern was not arbitrary and capricious. *Id.* We affirm the grant of summary judgment to the Federal Defendants on this claim.

### E.  Selection of the Preferred Alternative in the EIS

American Rivers argues that the Corps' selection of the Preferred Alternative ("PA") was arbitrary and capricious because the Corps did not sufficiently explain why the PA was superior to plan GP2021, favored by American Rivers. Plan GP2021 included the spring rise and summer low flow prescribed by the 2000 BiOp RPA, while the PA became the 2004 Master Manual.

The EIS contains summary statements about the selection of the PA, such as:

> The Corps believes that the PA, when combined with the other measures . . . , conserves more water in the upper three lakes during extended droughts, meets the needs of ESA-listed fish and wildlife species, is consistent with the Corps' responsibilities under environmental laws and tribal trust responsibilities, and provides for the Congressionally authorized uses of the System.

American Rivers argues that because plan GP2021 also generally meets those same criteria and outperforms the PA with respect to wildlife concerns, the Corps' decision to select the PA has not been sufficiently explained. "[A]n agency must cogently

explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs.*, 463 U.S. at 48.

NEPA requires an agency to present the EIS alternatives in comparative form, "sharply defining the issues and providing a clear basis for choice among options by the decision-maker and the public." 40 C.F.R. § 1502.14. In this case, the EIS included a detailed comparative analysis of the effects of all five alternatives on a wide range of interests including fish and wildlife resources, flood control, water supply, hydropower, recreation and navigation. This analysis, presented in a series of tables, enables the reader to compare the relative effectiveness of each of the alternatives, as required by NEPA. For example, the Federal Defendants point to tables showing the strong superiority of the PA over plan GP2021 in maximizing summer revenue from reservoir hydropower production while creating far less risk of disruption for downstream summer power generation. The tables also show that the PA outperforms plan GP2021 in the areas of navigation, groundwater damage and floodplain crop damage. "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

Contrary to what American Rivers seems to suggest, there is no further NEPA or Administrative Procedure Act requirement to repackage the information in the summary tables into prose one-to-one comparisons of the PA with each of the other alternatives. We conclude that the comparisons provided in the EIS "cogently explain why [the Corps] has exercised its discretion in a given manner." *Motor Vehicle Mfrs.*, 463 U.S. at 48. Therefore, we affirm the grant of summary judgment to the Federal Defendants on this claim.

**F.    Claim of the Mandan, Hidasta and Arikara Nation Regarding the Management of Lake Sakakawea**

The Nation claims that the Corps has failed to choose the FCA- and ESA-compliant reservoir management plan that best spurs economic self-sufficiency for the Nation's members and protects the Nation's cultural resources.  The Nation seeks a court order to enjoin the Corps to correct these "deficiencies."   The MDL court dismissed the Nation's claim for lack of Article III standing.

To show Article III standing, a plaintiff must demonstrate (1) an "injury in fact" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," (2) "a causal connection between the injury and the conduct complained of," and (3)  a likelihood, as opposed to mere speculation, "that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quotations omitted).

The Nation articulates its members' general interest in the operation of Lake Sakakawea, including an interest in the economic health of the sport fishing industry located there.  However, the Nation does not articulate how reservoir operations under the 2004 Master Manual cause an injury to the Nation that can be redressed by a favorable court decision.  There is nothing in the amended complaint, for example, stating why reservoir operation under the 2004 Master Manual, which is more sensitive to reservoir recreation needs during prolonged droughts than was the 1979 Master Manual, will damage the viability of Lake Sakakawea's sport-fishing industry. Furthermore, if we were to do exactly as the Nation requests in its amended complaint and order the Corps to re-formulate the 2004 Master Manual in a manner that, given FCA and ESA constraints, would best "spur Tribal self sufficiency and economic development and protect Indian trust assets," it is not at all clear what outcome could be adjudged to comply with our order.  The Nation simply has not set forth a "concrete and particularized" injury that is likely to be redressed by such an order.

*Lujan*, 504 U.S. at 560-61.  Therefore, we affirm the dismissal of this claim for lack of Article III standing.

### G.   Extra-Record Materials Offered by American Rivers

Nebraska challenges the submission of three declarations by American Rivers that were not part of the administrative record.  The MDL court apparently considered Nebraska's motions to strike these declarations to be moot.  Because we affirm the grant of summary judgment to the Federal Defendants on American Rivers' claims, we also find Nebraska's motions to strike to be moot.

## III.   CONCLUSION

On the following three claims, we vacate the MDL court's grant of summary judgment to the Federal Defendants and instruct the MDL court to dismiss without prejudice:  (1) NPPD's claim that the FWS failed to consider the economic feasibility of the summer low-flow requirement in developing the 2003 Amended BiOp; (2) Missouri's claim that the loss of shallow water habitat for larval and juvenile pallid sturgeon in central Missouri resulting from summer low flow constitutes an impermissible "take" of the sturgeon under ESA § 9; and (3) Blaske Marine's NEPA claim that a supplemental EIS is required for the 2003 Amended BiOp summer low-flow requirement.  On all other claims, we affirm the judgment of the MDL court.

_____