# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1149

_____

In re: Operation of the Missouri     *
       River System Litigation.     *
------------------------------------------------ *
State of Missouri,     *
    *
       Plaintiff - Appellant,     *    Appeal from the United States
    *    District Court for the
       v.     *    District of Minnesota.
    *
United States Army Corps of     *
Engineers, et al.,     *
    *
       Defendants - Appellees.     *

_____

Submitted: October 5, 2007
Filed: February 8, 2008

_____

Before LOKEN, Chief Judge, RILEY and SMITH, Circuit Judges.

_____

LOKEN, Chief Judge.

The United States Army Corps of Engineers ("Corps") manages the Missouri River Mainstem Reservoir System (the "System") under the Flood Control Act of 1944, Pub. L. No. 78-534, 58 Stat. 887, 891 (1944). The System consists primarily of a series of dams and reservoirs on the upper River. The Corps' governing operational document is the Missouri River Mainstem Reservoir Master Water Control Manual (the "Master Manual"), which has been revised five times since its

initial adoption in 1960. The Corps also publishes specific operational details in an Annual Operating Plan.

In recent years, persistent drought conditions have challenged the Corps' ability to perform its dominant Flood Control Act functions of flood control and maintaining downstream navigation while also continuing to benefit secondary uses such as irrigation, recreation, fish, and wildlife. Forced to make difficult choices, the Corps has faced repeated lawsuits by competing beneficial users of the River as controlled by the System. In South Dakota v. Ubbelhode, 330 F.3d 1014 (8th Cir. 2003), cert. denied, 541 U.S. 987 (2004), we reversed the grant of preliminary injunctions preventing the Corps from releasing drought-depleted waters from reservoir lakes in South Dakota and North Dakota in order to maintain downstream navigation. Meanwhile, environmental groups sued, and the Judicial Panel on Multi-District Litigation consolidated all actions in the District of Minnesota. In March 2004, the Corps issued a revised Master Manual ("the 2004 Master Manual") containing provisions prompted by a Biological Opinion issued by the U.S. Fish and Wildlife Service ("FWS") under the Endangered Species Act. See 16 U.S.C. § 1536. Competing users challenged the actions of both agencies on numerous grounds. In In re Operation of the Missouri River System Litigation, 421 F.3d 618 (8th Cir. 2005), cert. denied, 547 U.S. 1097 (2006) (hereinafter "Mo. River"), we affirmed the district court's grant of summary judgment in favor of both agencies.

In this action, a sequel to Mo. River, the State of Missouri claims that the Corps violated the National Environmental Policy Act ("NEPA") by implementing March 2006 revisions to the 2004 Master Manual without preparing a supplemental environmental impact statement ("SEIS"). The district court[1] granted the Corps' motion for summary judgment. Missouri appeals. We conclude that the Corps' actions were not arbitrary and capricious and therefore affirm.

---

[1]The HONORABLE PAUL A. MAGNUSON, United States District Judge for the District of Minnesota.

# I.

Acting under the Endangered Species Act, FWS listed the least tern[2] as endangered and the piping plover as threatened in 1985 and the pallid sturgeon[3] as endangered in 1990. In developing the 2004 Master Manual, the Corps consulted FWS after both agencies determined that operation of the System jeopardizes these protected species. In 2000, FWS issued a Biological Opinion ("BiOp") that included a Reasonable and Prudent Alternative ("RPA")[4] recommending various actions by the Corps to mimic the natural hydrograph of the River to benefit the listed species. See Mo. River, 421 F.3d at 625-26. A key recommendation was a "spring rise" -- a controlled release of additional water from the Gavins Point Dam for thirty days every three years. The BiOp explained that the spring rise would act as a spawning cue for pallid sturgeon, provide an influx of nutrients from the floodplain for all three species, and scour sandbars to allow terns and plovers to nest more safely.

In the Final Environmental Impact Statement ("FEIS") for the 2004 Master Manual, the Corps analyzed the projected economic and environmental effects of five alternatives to the then-current water control plan -- four spring rise/summer low flow release options from the Gavins Point Dam based upon the FWS RPA, and a Modified Conservation Plan that did not include a spring rise but instead focused on drought conservation measures, reservoir balancing, minimum water flows, and

---

[2]A subspecies, *Sternula antillarum athalassos*, that breeds solely on the inland rivers of the Mississippi River basin.

[3]The Pallid Sturgeon first evolved seventy million years ago and ranges from the Yellowstone River in Montana throughout the Missouri River and into the lower Mississippi River. The pallid sturgeon grows up to eighty pounds, reaches six feet in length, and lives an average of sixty years. Changes made by the Corps to the natural hydrograph of the Missouri River have caused a precipitous drop in natural sturgeon reproduction, particularly on the lower River below Gavins Point Dam.

[4]See 16 U.S.C. § 1536(b)(3)(A).

implementation of an adaptive management process to give the Corps flexibility to adjust the System. The FEIS chose the Modified Conservation Plan as its Preferred Alternative but noted that the absence of a spring rise may result in "jeopardy of the three listed species" and non-compliance with the Endangered Species Act.

After reviewing the FEIS and consulting with the Corps, FWS issued an amended BiOp in November 2003 (the "2003 Amended BiOp") that gave the Corps two more years to develop an acceptable alternative to the spring rise. If no alternative was developed, the FWS amended RPA imposed a default plan including a spring rise beginning in 2006 for the benefit of the endangered pallid sturgeon. The default plan prescribed an annual "bimodal" spring rise, with releases from the Gavins Point Dam in both March and May. In March 2004, the Corps adopted the 2004 Master Manual including the Modified Conservation Plan. The agency's Record of Decision ("ROD") acknowledged a continuing obligation to evaluate a spring rise as mandated by the 2003 Amended BiOp. The ROD declared:

> Decisions concerning implementation of additional measures . . . including potential release changes out of Gavins Point Dam, will be made through the adaptive management process. The two-year re-evaluation will include input from Missouri River stakeholders to foster conservation of Endangered Species Act-listed species and the broader ecosystem values of the Missouri River while providing other Congressionally authorized System project purposes.

In Mo. River, rejecting multiple attacks on the 2004 Master Manual based on the Flood Control Act, the Endangered Species Act, and NEPA, we described the 2004 Modified Conservation Plan as "a plan consistent with the 2003 Amended BiOp." 421 F.3d at 627.

Following adoption of the 2004 Master Manual, the Corps formed a Plenary Group of numerous Missouri Basin stakeholders, including the Missouri Department of Natural Resources, to develop a recommendation on the spring rise issue. The

Plenary Group met four times in the summer of 2005. Though unable to reach a consensus, the Group provided input and technical assistance. In October, the Corps released for review and comment a draft Annual Operating Plan and draft technical criteria for a Spring Pulse Water Control Plan. Like the FWS amended RPA, the Plan includes a bimodal spring rise -- annual releases from the Gavins Point Dam in March and in May. Both the March pulse and the May pulse are precluded if the reservoir system is not storing at least 36.5 million acre feet of water in the first year and 40 million acre feet in any subsequent year. If not precluded, the March pulse begins the day after the flow out of Gavins Point Dam reaches the minimum level necessary for downstream navigation. The pulse consists of a two-day peak release of up to 5,000 cubic feet per second in addition to the existing flow, followed by gradually reduced releases for five days until the flow is reduced to the non-pulse downstream flow level. The May pulse begins between May 1 and May 19, depending upon water temperatures, and increases by approximately 6,000 cubic feet per second per day until the two-day peak is achieved. The peak varies depending upon factors such as system storage, downstream flow limits, and the risk a release will "take" threatened or endangered species. The pulse is then reduced over ten days to the non-pulse downstream flow level.

Following public meetings and a two-month public comment period, the Corps prepared an EA comparing the impacts of the proposed bimodal spring rise plan, the default bimodal spring rise plan in the FWS 2003 Amended BiOp, the spring rise alternatives analyzed in the 2004 FEIS, the pre-2004 water control plan, and the Modified Conservation Plan adopted in the 2004 Master Manual. The EA calculated the benefits provided by each plan measured by fifteen different criteria.[5] It reported

[5]Flood control, hydropower, water supply, recreation, navigation, national economic development, young-of-year reservoir fish production, reservoir coldwater fish habitat, river coldwater fish habitat, river warmwater fish habitat, riverine native fish physical habitat, riverine tern and plover habitat, wetland habitat, riparian habitat, and historic and cultural properties.

that the impacts of the proposed bimodal spring rise plan "are within the range of impacts of the alternatives considered in [the] FEIS that contained spring pulse releases." The EA also compared the proposed bimodal spring rise plan with water release data from the operation of the System since its inception in 1967, concluding that the proposed peak releases "are well within the normal operating range of Gavins Point Dam" and significantly lower than the historical maximum daily release rates set in 1997. Analyzing historical flood damage data, the EA also reported that, because of downstream flow limits and other flood control measures, the proposed spring rise plan would rarely, if ever, result in increased flooding and crop damages beyond what would occur without a spring rise.

Based upon this analysis, the EA concluded "that there are no new significant environmental impacts of the proposed action that have not been evaluated in the FEIS and that warrant the preparation of a Supplement to the Final Environmental Impact Statement prior to implementation of the proposed action." In March 2006, the Corps issued an ROD revising the 2004 Master Manual to include the bimodal spring rise plan. Missouri, which has consistently opposed a spring rise because of its potential adverse effect on downstream flood control, commenced this action to enjoin implementation of the spring rise plan. The district court granted the Corps' motion for summary judgment, concluding that the Corps did not violate NEPA when it prepared an EA but then declined to prepare either an SEIS or a finding of no significant impact ("FONSI"). This appeal followed. Because drought conditions have persisted, only one spring rise release has occurred, in May 2006.

## II.

Missouri's primary contention is that the 2006 Master Manual revision was a major federal action significantly affecting the human environment, and therefore the Corps violated NEPA by failing to prepare an EIS or an SEIS. See 42 U.S.C. § 4332(2)(C). The Corps spent over fourteen years preparing the 2004 FEIS which included a comprehensive environmental analysis of various spring rise plans. Thus,

like the district court, we conclude that the relevant issue is whether the Corps was required to prepare an SEIS. Our review is governed by the Administrative Procedure Act's arbitrary and capricious standard. See 5 U.S.C. § 706(2)(A); Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 375-76 (1989). "We are not free to substitute our own judgment for that of the agency, but rather our role is to ensure that the agency has adequately considered and disclosed the environmental impacts of its actions." Arkansas Wildlife Fed'n v. U.S. Army Corps of Eng'rs, 431 F.3d 1096, 1100 (8th Cir. 2005) (quotations omitted).

NEPA does not address when an agency is required to prepare an SEIS. The Council on Environmental Quality ("CEQ") regulations provide that agencies:

> Shall prepare supplements to either draft or final environmental impact statements if: (I) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

40 C.F.R. § 1502.9(c)(1). The Corps' NEPA regulations provide that an SEIS should be prepared "whenever required" by the CEQ regulation. 33 C.F.R. § 230.13(b). Here, the Corps agrees that a spring rise will have a significant environmental impact; that is why it did not prepare a FONSI. Thus, the issue is whether an SEIS was required for the 2006 Master Manual revision under either the substantial change or the significant new circumstances standard in 40 C.F.R.§ 1502.9(c)(1). "A change is substantial if it presents a seriously different picture of the environmental impact" of the agency's actions. Arkansas Wildlife, 431 F.3d at 1102 (quotations omitted).

Missouri argues that an SEIS was required because the Modified Conservation Plan adopted in the 2004 Master Manual did not include a spring rise and therefore the 2006 revision adopting a spring rise is a substantial change from the agency's prior action. This contention is contrary to established law. A substantial change that requires an SEIS under 40 C.F.R.§ 1502.9(c)(1)(I) is one that is *not* "qualitatively

within the spectrum of alternatives that were discussed" in a prior FEIS.  Dubois v. U.S. Dep't of Agric., 102 F.3d 1273, 1292 (1st Cir. 1996), cert. denied, 521 U.S. 1119 (1997), quoting *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18026, #29b (March 23, 1981). For this reason, an agency's decision to select a previously rejected alternative is not a substantial change requiring an SEIS if "the relevant environmental impacts have already been considered."  Friends of Marolt Park v. U.S. Dep't of Transp., 382 F.3d 1088, 1097 (10th Cir. 2004); see Arkansas Wildlife, 431 F.3d at 1102 (SEIS required only if "the changed plans or circumstances will affect the quality of the human environment in a significant manner . . . not already considered by the federal agency"); Marsh, 490 U.S. at 374 (same, applying 40 C.F.R. § 1502.9(c)(1)(ii)).

This principle is consistent with cases holding that on-going actions such as operating a system of dams and reservoirs in drought years are not "major Federal actions" within the meaning of NEPA if the agency is "simply operating the facility in the manner intended."  Upper Snake River Ch. of Trout Unltd. v. Hodel, 921 F.2d 232, 235 (9th Cir. 1990).  As the Supreme Court recently observed, "[w]here the preparation of an EIS would serve 'no purpose' in light of NEPA's regulatory scheme as a whole, no rule of reason worthy of that title would require an agency to prepare an EIS."  Dep't of Transp. v. Public Citizen, 541 U.S. 752, 767 (2004).

Missouri further argues that an SEIS was required because none of the spring rise alternatives considered in the FEIS were bimodal.  Though literally true, the argument is misleading.  The default spring rise plan in the FWS 2003 Amended BiOp was bimodal, and the ROD adopting the 2004 Master Manual expressly noted the need for further action to comply with the 2003 Amended BiOp.  Thus, we held in Mo. River that the 2004 Master Manual was consistent with the FWS 2003 Amended BiOp.  421 F.3d at 627.  The issues in Mo. River included a NEPA challenge to the 2004 FEIS, yet no party argued that the FEIS was inadequate because the spring rise options it analyzed did not include the FWS bimodal default plan.  Any argument that

NEPA compliance required separate analysis of a bimodal plan should have been made in Mo. River, where we approved an FEIS omitting that analysis.

More importantly, the Corps has not ignored the issue whether a bimodal spring rise plan will have significantly different environmental impacts. In an analysis "tiered"[6] to the FEIS, the EA comprehensively compared the impacts of the bimodal spring rise in the 2006 Master Manual revision with the spring rise options studied in the FEIS and concluded that the bimodal spring rise plan is within the range of impacts previously studied and is not a substantial change from the historical range of release levels on the river. This was the proper inquiry under 40 C.F.R. § 1502.9(c)(1)(I). As there is no tenable claim of "significant new circumstances or information relevant to environmental concerns" within the meaning of 40 C.F.R. § 1502.9(c)(1)(ii),[7] we agree with the district court that the Corps was not arbitrary or capricious in deciding not to prepare an SEIS.

Finally, Missouri argues that the Corps violated NEPA when it failed to follow the EA with either an EIS or a FONSI. This is an unduly restricted view of the agency's options for complying with NEPA's procedural mandates. The Corps' regulations provide that an EA is used "for determining whether to prepare an EIS or a FONSI," and "[a] FONSI shall be prepared for a proposed action . . . for which an EIS will not be prepared." 33 C.F.R. §§ 230.10(a), 230.11. However, these provisions must be read in conjunction with CEQ's implementing regulations, see 33 C.F.R. § 230.1, which sensibly provide that "[a]gencies may prepare an environmental

---

[6]An EA may be tiered to an earlier EIS "to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision." 40 C.F.R. § 1502.20. A tiered analysis incorporates discussions from the EIS by reference.

[7]Missouri asserts that a U.S. Department of Agriculture statement that federal crop insurance will not cover losses from flooding caused by a spring rise is new information the impact of which was not analyzed in the EA. Missouri cites no evidence in the administrative record establishing that USDA has made any such crop insurance decision. Therefore, we decline to consider this unsupported assertion.

assessment on any action at any time in order to assist agency planning and decisionmaking." 40 C.F.R. § 1501.3(b). Neither the Corps' nor CEQ's regulations prescribe a specific process to determine whether to prepare an SEIS. Here, the Corps prepared an EA, not to help it decide whether to prepare an EIS, but rather to determine whether the change in agency action required an SEIS. As this case illustrates, it is reasonable to expect that the Corps will sometimes determine that a FONSI is not appropriate because the action being taken has a significant impact on the environment, but an SEIS is not required because the impact was sufficiently analyzed in an earlier FEIS. This approach is neither a misuse of the EA procedure nor a violation of NEPA.

The judgment of the district court is affirmed.

_____